## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00201-2 (DLF)** |
| **v.** | : | |
| | : | |
| **MICHAEL QUICK,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael Quick to three months home detention, followed by 36 months' probation, 60 hours of community service, and $500 restitution.

### I.      Introduction

The defendant, Michael Quick, a self-employed bench jeweler, and his friends Zachary Martin, Kari Kelley and brother Stephen Quick participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Michael Quick pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence three months home detention as part of a 36 months term of probation is appropriate in this case because: (1) the defendant entered the Capitol through a broken window (2) he was aware of the potential for violence because he stood inside the Senate wing door while a crowd chanted "fight

1

for Trump" as Capitol police were backed up against the wall;  (3) he was inside the Capitol for approximately 16 minutes; (4) he penetrated the U.S. Capitol to the House Wing Doors, past the Memorial Door and through the North and South areas of the Crypt; (5) he made a post on Facebook that it was peaceful at the Capitol; (6) he cooperated immediately and spoke to the FBI when they questioned him about January 6; and (7) he has a minimal criminal history.

Even if he didn't personally engage in violence or property destruction during the riot, before entering the Capitol on January 6, Michael Quick's presence encouraged and celebrated the violence of that day.  The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification and makes a sentence of home detention followed by probation both necessary and appropriate in this case.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the 2U.S. Capitol. *See* ECF  79  (Statement of Offense), at 2-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

2

*Michael Quick's Role in the January 6, 2021 Attack on the Capitol*

Michael Quick, Zachary Martin, Stephen Quick and Kari Kelley planned to travel together to Washington, D.C. to attend the "Stop the Steal" rally.  On January 4, 2021, Kari Kelley posted a Go Fund Me page seeking donations for the trip "…some friends and I are renting a Caravan and driving to Washington DC for the Jan 6th rally…" She obtained $130 in donations.

On January 5, 2021, Kelly posted a photograph of a map on Facebook indicating that she was with "Zac Martin" and two other persons, (Michael Quick and Stephen Quick) stating; "Almost there!!!"



On the morning of January 6, 2021, at 5:37 am Kelley posted a photograph on Facebook of all four defendants, tagging each defendant as present. The post stated: "Good Morning America . . . we are leaving our room and headed to the action."



After attending the former President's rally, Michael Quick and his codefendants joined the mob outside the Capitol and entered the Capitol where it was first breached by rioters at approximately 2:13 pm. U.S. Capitol Surveillance video, captured Michael Quick, Zachary Martin, Stephen Quick, and Kari Kelley entering the Capitol through a broken window adjacent to the Senate Wing door at approximately 2:54 pm. The initial breach of the Capitol occurred at the Senate Wing door and the window at approximately 2:13 pm.  The area was secured at approximately 2:27 pm and a second breach occurred at approximately 2:47 pm.  The defendant's entered approximately seven minutes after the second breach.  Michael Quick and his codefendants were in the middle of the mob near the Senate Wing Door as the second breach is occurring.  Defendant Kari Kelley encouraged her codefendants to come on.  She entered the Capitol first followed by Michael Quick, Stephen Quick and Zachary Martin.





*Defendant Kari Kelley*



*Defendant Michael Quick*



*Defendant Stephen Quick*



*Defendant Zachary Martin*

Security footage from about 2:56 p.m. shows Michael Quick, Zachary Martin, Stephen Quick, and Kari Kelley inside the capitol during the riot and proceeding near the door for the Senate Wing.

They turned to the right and walked past the shattered glass on the floor from the smashed-in window. From there, Michael Quick and his codefendants traveled down a hall past offices, through the Crypt, pass the Memorial Door and into the House wing.







Stephen Quick's SD [1] card also included video that appeared to be taken inside the Capitol. See

below for screen shots taken from the videos on Stephen Quick's SD card.



---

[1] A Secure Digital (SD) card is a tiny flash memory card designed for high-capacity memory and various portable devices, such as cellular phones or other personal digital devices".



As observed on security footage, the defendants paraded through the crypt and down to the House Wing Door. The crowd was yelling and chanting repeatedly "Fight for Trump." Codefendant Stephen Quick told the FBI that they chanted "Fight for Trump" a couple of times before proceeding through the Capitol.




*Photos of Defendants in the Crypt*





*Defendants by the House Wing Door*

During the riot, Zachary Martin "livestreamed" a video of himself in the Capitol on Facebook. The livestream video was in front of the portrait of former New York Congresswoman Shirley Chisholm. Michael Quick and his codefendants just stood around at the time of the livestreaming.



Zac Martin

In total, Michael Quick and his codefendants spent nearly 16 minutes inside of the Capitol. Michael Quick admitted that he knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they paraded, demonstrated and/or picketed within the building.

*Social Media Posts*

Michael Quick  posted to Facebook that everything was great and peaceful on January 6. He took down his Facebook due to people making comments as he said "blasting" him after the news reported the riot.   After the attack on the Capitol, several people reported to the FBI

witnessing Martin's livestream video from the Capitol on Facebook. The FBI was unable to locate any Facebook postings.

*Michael Quick's Interview*

Michael Quick voluntarily agreed to an interview with the FBI at his residence on January 21, 2021.  He did not know defendants Martin or Kelley very well but decided to travel together to the rally.  He left Missouri on January 5th and returned on January 7th.  He went to the rally because he wanted a recount of the election results and wanted Congress to investigate the irregularities and thought having bodies present would help.

They went to the rally and got separated from Kelley.  They made their way towards the Capitol to find her.  They wanted to see what was going on.  They had no plans to enter the Capitol. They went inside. Police were in riot gear and he saw at least one broken window.  The police were letting people in, they were all standing around.  "I had no idea it was trespassing. He claimed that he "didn't know that, that uh riots or anything like that had happened…"  He said it was public property. "You know there was a lot of violence and stuff, didn't even know. Um, well I [intelligible] like I lost a lot of friends I jumped off of Facebook because I said no it's peaceful, everything's great. I hadn't seen the news yet, everybody blasted me."

He stated that he did not witness any assault or violence or thefts. "It was ninety-nine point nine nine nine percent peaceful, and all that stuff, and then everybody's blasting me, you know, four people died -…"  For the most part he walked around with his hands in his pockets. He did not attempt to hide his face inside.

At one point someone took something from a desk and the crowd yelled at him calling him a looter and garbage.  He voluntarily showed the FBI his phone that contained video and attempted to send the video to the FBI but the video was never delivered.

*The Charges and Plea Agreement*

On February 10, 2021, Michael Quick was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On February 12, 2021, he surrendered himself to the FBI.  On March 10, 2021, Michael Quick was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 19, 2021, and Amended Information was filed charging the same four counts. On December 23, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building. By plea agreement, Michael Quick agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of home detention followed by probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with,

or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  The defendant's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

 Michael Quick and his codefendants organized the trip to Washington and they traveled from Missouri to DC.  According to his codefendant Stephen Quick, they were going to the "Stop the Steal" rally.  After the rally, they made their way to the Capitol and joined the mob of rioters.  They claimed to not have witnessed any violence or assaults despite the violent chants and police officers backed up against the wall.  Michael Quick and his codefendants described the crowd as peaceful, everyone having a good time and being totally unaware of any violence. This is contrary to the actual facts and an effort to minimize his culpability. However, he admitted to witnessing a theft inside the Capitol.

Michael Quick obviously made comments on Facebook about how peaceful things were at the Capitol and was "blasted" by people due to his comments. "You know there was a lot of violence and stuff, didn't even know. Um, well I [intelligible] like I lost a lot of friends I jumped off of Facebook because I said no it's peaceful, everything's great. I hadn't seen the news yet, everybody blasted me."

Michael Quick entered the building through a window that had been broken by the mob. While no police officers blocked his path, there were clear signs of violent entry. The door adjacent to the window through which Michael Quick passed had just been breached by the mob. They moved deeper into the U.S. Capitol. They would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm.



Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of home detention followed by probation in this matter.

### B.  The History and Characteristics of the Defendant

Michael Quick is 44-years old. As set forth in the PSR, Martin's criminal history consists of a Driving While Under the Influence on a Military Reservation resulting in 12 months' probation on February 26, 1999; possession of a controlled substance on April 1, 2008; and Wrongful distribution of hallucinogens on October 16, 1998, which resulted in a discharge from the Army in March of 1999. ECF 84 ¶¶ 41-46.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Michael Quick's actions and words in his pre-arrest interview demonstrate the need for specific deterrence for this defendant. Michael Quick thought he did nothing wrong. He did not perceive the yelling mob entering a broken window in the face of police in riot gear to be a dangerous threatening situation. The government acknowledges that the defendant accepted responsibility early by turning himself in and entering into this plea agreement. However, his sense of reality regarding the "peacefulness" of what was happening on January 6 underscores the need for specific deterrence in this case and home detention will prevent him from engaging in similar conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The defendant has pleaded guilty to Count Four of the Amended Information, charging him with parading, demonstrating, or picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the

Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants[5], the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on by this Court on *United States v. Carey Jon Walden* 21-cr-00548 (DLF) of 30 days home detention followed by 36 months' probation and community service. Michael Quick like Walden entered a

---

[5] In this case, the court will be sentencing codefendants that planned to travel to Washington together to attend a "Stop the Steal" rally.   They traveled together from Missouri, shared a hotel room, traveled to the rally and Capitol and all entered the Capitol together through a broken window and paraded through the building.  Most of their factors are the same but they are individuals, and the sentences will not necessarily be the same.

guilty plea to the same count.  Neither engaged in violence, both climbed in the same window, had a history of DUI and former military service. Counsel for Michael Quick advised early on of his desire to enter a plea. See also *Richard Barnard* 21-Cr-00235 (RC) who was sentenced to 30 days home detention followed by probation.

Finally, when considering sentence disparities, the Court should compare  Michael Quick, Kelley, Martin and Stephen Quick to each other.  Although they traveled together, entered the same window, and paraded through the Capitol together, there are differences in their conduct and history justifying different sentences.  For instance, while many defendants debriefed with the government as required by their plea agreements, Michael Quick and Stephen Quick did so before any agreement was on the table; before they had even been charged; and with no promise of any benefit.  In their debriefs, they admitted their conduct although minimizing, and Stephen Quick shared video footage from outside and inside the Capitol. Michael Quick and Stephen Quick admitted witnessing looting in the Capitol. Kelley on the other hand provided a false statement about why she entered the Capitol and encouraged her codefendants to follow her. Most disturbing and distinguishing is that Kelley tested positive for cocaine while on pretrial release. Martin and the Quick brothers did not violate the Court's release conditions by testing positive for cocaine. Martin failed to report to pretrial on two occasions and has more criminal history than Kelley or the Quick brothers. In the PSR  83 ¶55 Kelley denied having an addiction to alcohol and denied experimenting with any other substances, whereas her codefendants seemed to provide truthful information to probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of home detention and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Michael Quick to three months of home detention followed by 36 months' probation, 60 hours of community service and $500 restitution.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:      */s/ Brenda J. Johnson*
Brenda J. Johnson
Assistant United States Attorney
National Security Section
U.S. Attorney's Office
555 4th Street, N.W., Room 11-450
Washington, D.C.  20530
Office: 202-252-7801
Brenda.Johnson@usdoj.gov