**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 21-cr-201 (DLF) |
| ) | |
| MICHAEL AARON QUICK, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

**COMES NOW**, Defendant Michael Quick, by and through Counsel, Joseph Passanise and Taylon Sumners of WAMPLER & PASSANISE LAW OFFICE, and moves this Court for a sentence of a fine and 12 months' probation in accordance with the following Legal Suggestions:

**RELEVANT FACTORS IN THE INSTANT CASE**

**I.     Offense Characteristics**

Michael Quick was 49 years old when he Pled Guilty to Count Four of the Criminal Information, for Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 USC § 5104(e)(20(G) on December 23, 2021, (Pre-Sentencing Investigation Report hereinafter referred to as PSI at page 4, paragraph 7). Quick has remained on Pre-Trial Supervision since February 12, 2021, and has had **no** violations during the pendency of this case. He has fully cooperated with the FBI and the House Investigative Committee.

On a whim, Quick decided to travel to Washington, D.C. for the "Stop the Steal Rally" with three others: Stephen Quick (his older brother), Zachary Martin, and Kari Kelley. The Quicks purchased VIP seating for the rally, without even knowing all of the speakers coming to the rally. Rather, Quick, his brother Stephen, and friend Zachary Martin felt compelled to be a

1

number in the crowd at the rally as patriots based on the skepticism surrounding the integrity of the 2020 election results.

The Quicks and Martin had never participated in a political rally revolving around the 2020 election before January 6, nor donated to interest groups during the election process. The four rented a van and drove to Washington to do what they felt at the time was their civic duty. The spur of the moment decision to make the trip from Missouri to Washington by van had them were concerned at the prospect of even finding a hotel room. Prior to attending the rally upon arriving in Washington, the four made a pact to meet at a monument if they were separated at any point, given the voluminous number of attendees.

Once the rally began, Kelley broke away from the group to use the restroom. The Quick brothers and Martin eventually met at the monument, with no hope of finding Kelley due to the large crowd and lack of cellphone battery and/or service. Eventually, the three men were advised Kelley was at the Capitol and told to head that way. The three men ventured towards the Capitol, which was never their initial plan in going to Washington.  The men could not have anticipated what was going to happen.

It is important to understand that the Quicks had **no** intention of entering the Capitol when the trip was planned, or even once they arrived in Washington, or even during attendance at the Rally.  After getting closer to the Capitol, the Quick brothers, along with many others, chose to enter the Capitol through a window, which had been previously broken through **no** action of the Quicks or any member of their group (PSI at 9:32).

While inside the Capitol, the Quicks took the role of observers, and did not participate in chants, deface Capitol property or encourage others to do so, or trying to enter other areas of the Capitol as many other attendees chose to do. The Quicks also witnessed fist-bumping between

2

other attendees and police officers, while present inside the Capitol, as evidenced in security footage. Overall, Michael Quick was unaware of where he even was within the Capitol and was only inside of the Capitol at a maximum time of fifteen minutes, possibly even less estimating the time at five to fifteen minutes (PSI at 6-7:21). The Quick brothers did not touch anything while inside and simply observed, took photos, and walked through in search of an exit. Martin and the Quick brothers reacted quickly and peacefully exiting the building and travelled back to Missouri.

On January 21, 2021, Michael voluntarily sat down with the FBI and disclosed his limited involvement in the January 6 incident (PSI at 6:21). During this initial interview, Quick expressed remorse at his involvement in going into the Capitol on January 6 and openly participated in turning over any evidence documenting his brief time in the Capitol (PSI at 7:21). Quick later sat down voluntarily on two separate occasions for at least an hour each time to subject himself to interviews with both the FBI and the House Investigative Committee to assist in the investigation and understanding of the January 6 incident.

Quick misinterpreted the actions of Capitol Police during the incident believing the police were allowing people to enter the building and telling people where the exits were (PSI at 7:21). Quick, understanding the magnitude of the incident has expressed remorse for entering the Capitol on January 6 through a broken window, despite not participating in or encouraging any type of damage or injury to the Capitol or those protecting the Capitol. Quick, like those he traveled with, felt called to go to Washington to promote election integrity and show his support, nothing more. Quick and his comrades had no master plan to enter the Capitol on January 6, but rather made a reckless decision driven by adrenaline and curiosity.

**II.     Personal History**

Michael Quick was born in New Mexico on May 11, 1997, to his parents, still living, with two brothers, one of whom is five years older and also went to the Capitol on January 6 (PSI at 12:49-50). Quick has never been married, but prior to this incident Quick was in a relationship for fourteen years with a woman who had a child from a prior relationship, who he assisted in raising (PSI at 13:53). The termination of the relationship was somewhat devastating to Quick and his goal prior to deciding to travel to Washington was just to get out of town. Initially, Quick intended to go to the beach, but when the opportunity arose to show support for his country, Quick felt compelled to be a number in the crowd at the rally. In the aftermath of the relationship, Quick has suffered from depression and did seek treatment and medication, which he eventually stopped and currently denies having physical or mental health issues (PSI at 13:56-58).

Quick graduated from Reed Springs High School in Missouri and subsequently attended courses at Ozark Technical College and Troy State University before enlisting in the U.S. army from 1997 to 1999 (PSI at 14:62-63). Quick received a DD-214 for honorable discharge, along with honors such as the Army Service Ribbon and Bronze German Armed Forces Efficiency Badge (PSI at 14:63). Quick has maintained employment with his family business for over ten years, Artisan Jewelers in Nixa, Missouri, which he assists in managing and operating with his siblings and mother (PSI at 14:64-65).

Quick's criminal history dates back almost twenty years ago to when Quick was still in his twenties (PSI at 11:41-45). Two of the alleged offenses actually stem from the same incident in 1998 and Quick was reprimanded by the army, and still elligible to receive a DD-214 and honors upon discharge (PSI at 11:-12:45-46).

**LEGAL SUGGESTIONS**

I.     **18 U.S.C. § 3553(a) FACTORS APPLIED TO DEFENDANT**

Pursuant to 18 U.S.C. § 3553(a)(1), the Court shall consider the nature and circumstances of the offense and the history and characteristics of the Defendant. Under 18 U.S.C. § 3553(a)(2), the factors regarding a need for a sentence to be imposed include: (A) reflecting the seriousness of the offense to promote respect for the law and just punishment; (B) to afford adequate deterrents to criminal conduct; (C) to protect the public from further crimes; and (D) to provide the Defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.

In the case-at-bar, Defendant, Quick maintained a fourteen year relationship assisting in the raising of a child who was not his biological child and operates Artisan Jewelers, a family business. All of these factors demonstrate that Quick has a strong sense of responsibility. Further, Quick continues to maintain a strong support system who holds him accountable in his, family and friends. This suggests a better chance of leading a productive life after the conclusion of this matter than the average similarly situated Defendant. Other than the instant offense, which has humiliated him and was Quick's first criminal offense since 2006 (sixteen years). Quick has otherwise lived a law- abiding life and still maintains an excellent reputation for his good character as evidenced by the numerous good character letters.

In considering 18 U.S.C. § 3553(a)(1), it is important to reiterate that Quick had no planned intention of entering the Capitol, was only inside of the Capitol for a matter of minutes, and did no damage to any Capitol property or protector. By voluntarily sitting with the FBI and the House Investigative Committee to be interviewed for at least an hour, Quick has exhibited an extraordinary demonstration of acceptance of responsibility in this matter. Further, similarly

situated Defendants who have been sentenced for unlawfully entering the Capitol on January 6 have received probation.

Overall, 18 U.S.C. § 3553(a)(A)-(C) will be more than satisfied by a sentence of probation based on Martin's limited role in the entirety of the January 6 incident, responsibility to his children and business, as well as his remorse for entering the Capitol unlawfully.

## II. DEFENDANT'S EXCELLENT EMPLOYMENT HISTORY

In *U.S. v. Chase*, 560 F.3d 828, 829 (8th Cir. 2009), the Defendant Pled Guilty to possession with intent to distribute methamphetamine and conspiring to distribute methamphetamine. The Eighth Circuit subsequently held that the Defendant's excellent employment record could support a downward variance. *See id.* at 831. In *United States v. Blake*, 89 F. Supp. 2d 328, 331 (E.D.N.Y. 2000), the Defendant Pled Guilty to bank robbery and assault during the commission of a bank robbery. The Court granted a departure from level 29 to level 8 with probation, given the Defendant's progress in maintaining employment and the fact opportunities for rehabilitation in federal prisons were decreasing based on the rising prison population. *See id.* at 337.

Here, Quick has a lengthy employment history, maintaining employment with his family over ten years at Artisan Jewelers. Despite the present offense, Quick has worked to maintain the business he and his family have built. It would be detrimental for Quick, his business, his family (co-workers), and his clients if Quick were to be taken into custody for any period of time. Based on Quick's extensive employment history, a departure should be warranted under the courts' ruling in *Chase* and *Blake*. *See* 89 F. Supp. 2d at 331; 560 F.3d at 829.

### III.     CONCLUSION

Pursuant to 18 USC § 3553(a), a sentence of a fine and probation is respectfully recommended as sufficient, but not greater than necessary, as it reflects the seriousness of the offense, promotes respect for the law, provides just punishment, serves as a deterrent to criminal conduct, and protects the public from further crimes.  Such a sentence also takes into consideration the nature and circumstances of the offense and the history and characteristics of Quick. Given Quick's lapse in judgement in entering the Capitol for a matter of minutes without disturbing anyone or anything in the Capitol, Quick should receive a sentence of probation, as opposed to the Government's recommendation of home detention.

WHEREFORE, for each of the above stated reasons and in combination of all of the factors, Defendant respectfully requests probation be granted with special conditions under supervised release and for such other and further relief as the Court deems just and proper

RESPECTFULLY SUBMITTED,

_____/s/Joseph S. Passanise_____
JOSEPH S. PASSANISE, MO Bar #46119
TAYLON M. SUMNERS, MO Bar # 73114
Attorneys for Defendant

WAMPLER & PASSANISE
LAW OFFICE
Attorneys at Law
2974 E. Battlefield
Springfield, MO  65804
joe@deewampler.com
taylon@deewampler.com
PH: (417)882-9300
FAX: (417)882-9310

**Certificate of Service**

I hereby certify that on the 11th day of March 2022, I electronically filed the foregoing with the U.S. District Court Clerk for the Eastern District of Missouri using the CM/ECF system which sent notification of such filing to U.S. Attorney, St. Louis, Missouri.

     /s/Joseph Passanise_____
Joseph S. Passanise
Taylon Sumners
Attorneys at Law